jar/lml

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

IN RE WESTAR ENERGY, INC. ,      )
ERISA LITIGATION               )
                                  )
                                  )      **Master Case No. 03-4032-JAR**
                                  )
_____     )

### OMNIBUS MEMORANDUM AND ORDER GRANTING IN PART AND
### DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

This is an action filed by Richard A. Toledo, on behalf of himself and all others similarly situated

("Plaintiffs"),[1] a putative class action by participants in the Westar Energy, Inc. Employees' 401(k)

Savings Plan, formerly the Western Resources, Inc. Employees' 409(k) Savings Plan, (collectively the

"Plan"), complaining of violations of the Employee Retirement Income Security Act, 29 U.S.C. §§

1000-1461, ("ERISA") by defendants.

In this Omnibus Order, the Court rules on the various defendants' motions to dismiss, to wit:

Westar Energy, Inc. ("Westar" or the "Company")[2] and Investment and Benefits Committee (the

---

[1]The Lead plaintiff is Richard A. Toledo. Other named plaintiffs are: Scott A. Hilderbrandt; Billy J. Williams; Randy J. Herman; Marsha Ericson; Donald L. Croucher; Marty J. Cummings, Jr.; Maria A. Gonzalez; Larry Kampschroeder; Stephen Randel; George Ludwig; Mark A. Mueller; Steven M. Short; Thomas Engelken; Ronald J. Leiker; William Dale Renner; Robert L. Griffith; Robert W. Mackey; James A. Stanley; Thomas F. Hodges; Carl M. Joost; Paul E. Lira; James M. File; Sandra S. Cummings; Joe Zwiesler; Rosa M. Nicholson; and Harold J. Holmes. Named and unnamed plaintiffs are current or former employees of Westar and participants in the Plan, pursuant to § 3(7) of ERISA 29 U.S.C. § 1102(7). Plaintiffs hold or held Westar shares in their retirement investment portfolios and have allegedly suffered losses to their retirement savings. The Court has consolidated this action and appointed Liaison and Lead Counsel for Plaintiffs. (See Doc. 9).

[2]The Complaint alleges that Westar's predecessor was Western Resources, Inc.; Westar was the divisional name for Western Resources' utility division, which also included Western's Kansas Power & Light and KGE electric utilities. On June 19, 2002, the company formally changed its name to Westar Energy. In this case, the

"Committee")  (Doc. 50); David Wittig (Doc. 53 ) ("Wittig"); Geist, Akin, Irick, Moore, McKee and Martin (Doc. 51); Koupal (Doc. 52); and Terrill (Doc. 55) (collectively the "Individual Defendants").[3] The Court grants defendants' motion for leave (Doc. 59) to renew their opposition and response. The Court also denies plaintiffs' motion for leave to file surreply (Doc. 41),[4] which renders moot the response (Doc. 54) of Westar and the Investment and Benefits Committee as well as the motion (Doc. 58 ) of defendants Geist, Akin, Irick, Moore, McKee and Martin for leave to file surreply.

For the reasons explained below, the Court largely denies defendants' motions to dismiss plaintiffs' claims.  Specifically, the Court will dismiss plaintiffs' imprudent investment claim insofar as it alleges defendants should have amended or modified the Plan, as well as plaintiffs' misrepresentation and omission claim against defendants Martin and Irick.  Defendants' motions to dismiss will otherwise be denied.

## I.    Background

### A.    Nature of the Case and Plaintiffs' Claims

The facts, for purposes of these motions to dismiss, are taken as true from plaintiffs' Complaint.

---

Court's references to the "Company"  includes Westar Energy and its predecessor company, Western Resources, Inc.

[3]The defendants are: Westar Energy, the employer and sponsor of the Plan; the Investment and Benefits Committee (Committee), the administrator of the Plan; and David C. Wittig, formerly the Chief Executive Officer of Westar Energy.  Also named as defendants are nine individuals who were members of the Committee at various times:  Paul R. Geist; Bruce A. Akin; Larry D. Irick; James A. Martin; Carl M. Koupal, Jr.; Richard D. Terrill; William B. Moore; and Ira W. McKee, Jr. (the Committee members).   The Complaint also names as party defendants "Unknown Fiduciary Defendants 1-100."  Defendant Mark Ruelle was voluntarily dismissed in an order on February 23, 2005 (Doc. 63), on plaintiffs' motion.

[4]This motion sought leave to file a surreply to the first round of motions to dismiss.  This Court denied those motions to dismiss (Docs.14,16, 19, 22, 24, 27 and 29) without prejudice in an Order entered on August 26, 2004 (Doc. 44 ), but invited the parties to renew these same motions after efforts to mediate this case were not successfully concluded.  Plaintiff renewed its motion for leave to file surreply in Doc. 59.

On October 22, 2003, Plaintiffs filed a Consolidated Amended Complaint pursuant to ERISA §§

502(a) and 502(e)(1)[5] for breach of fiduciary duty concerning the 401(k) Plan sponsored by the

Company.[6] Highly summarized, plaintiffs allege that the defendants are all fiduciaries with respect to the

Plan, and in that capacity breached their fiduciary duties of prudence and loyalty with respect to a

number of risky, abusive, aggressive and illegal acts that ultimately resulted in loss of Plan assets and

lost value of Plan investments, all to the detriment of plaintiffs. Plaintiffs contend that the defendants

breached their fiduciary duties through, *inter alia*, engaging in, allowing, failing to monitor, failing to

disclose, misleading communications (through representations and omissions) and through failing to

appropriately respond to the risky, abusive, aggressive, illegal and wrongful conduct of themselves and

others. The proposed Class includes "[a]ll persons who were participants in or beneficiaries of the Plan

at any time between July 1, 1998 and January 1, 2003 (the 'Class Period')."

The Consolidated Amended Complaint (the "Complaint") is 77 pages long, comprising 222

numbered paragraphs. The Complaint describes: the defendants' "Fiduciary Status;" the Company's

"Misleading and Ill-Conceived Plan for Restructuring;" the Company's "Plan to Use a Utility User Rate

Increase as a Means for Hiding Westar's Mountain of Debt;" "Other Bad Acts by the Defendants

During the Class Period That Harmed the Plan and Plan Participants;" and causation and damages.

---

[5] 29 U.S.C. §§ 1132(a) and 1132(e)(1).

[6] Between January and March 2003, five separate class action complaints were filed in this Court against Westar and others for alleged violations of the federal securities laws. Each of these complaints purported to allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"). The complaints were consolidated, and on September 1, 2005, the Court entered an Order and Final Judgment approving settlement of the securities class action. *See In re Westar Energy, Inc. Securities Litigation*, No. 03-4003-JAR (D. Kan. Sept. 1, 2005). The related securities derivative action was also settled at that time. *See Epstein v. Wittig, et al.*, No. 03-4081-JAR (D. Kan. Sept. 1, 2005).

Plaintiffs bring five claims for relief that the Court will refer to as: (1) imprudent investment claim; (2) internal monitoring and disclosure claim; (3) misrepresentation and omission claim; (4) breach of loyalty claim; and (5) co-fiduciary claim.

## B.    The Plan

The Complaint avers and states the following relevant facts.  Westar Employee's 401(k) Savings Plan is an employee benefit plan as defined by § 3(2)(A) of ERISA.[7]  The Company is the Plan's sponsor within the meaning of § 3(16)(B) of ERISA,[8] and the Plan is a "qualified cash or deferred arrangement" within the meaning of § 401(k) of the Internal Revenue Code.[9]  The currently effective instrument for the Plan is entitled "Westar Energy, Inc. Employees' 401(k) Savings Plan," amended and restated January 1, 2001.[10]  The Plan is available automatically to all full-time employees, who may contribute up to 50% of their pre-tax earnings[11] and one percent to four percent of eligible after-tax earnings.  The Company matches employee's contributions up to a maximum of 50%[12] of the first six percent of the participant's contributions.  Included among the Plan's investment alternatives is

---

[7]29 U.S.C. § 1002(2)(A).

[8]29 U.S.C. § 1002(16)(B).

[9]26 U.S.C. § 401(k). According to the Company's 11-K filed for the year ending December 31, 2002, effective January 1, 2003, the portion of the Plan consisting of the Company stock (referred to as the ESOP) is designated as a stock bonus plan within the meaning of § 401(a) of the Internal Revenue Code and an employee stock ownership plan within the meaning of § 4975(e)(7) of the Internal Revenue Code.

[10]   The predecessor Plan was sponsored by Western Resources, Inc., the predecessor in interest to Westar Energy.

[11]Prior to July 1, 2002, participants were only able to contribute between 1% and 14% of the pre-tax earnings to the Plan.

[12]Or 65% for participants who are members of collective bargaining groups.

the Westar Energy Common Stock Fund. Westar may match contributions with either Westar common stock or cash. Throughout the Class Period, Westar elected to match contributions with Westar stock. In fact, until April 1, 2002, Company matching contributions were effectively locked into Westar stock, for matching contributions were not permitted to be transferred into other investment accounts.[13]

The Plan is administered by the Committee, which is tasked with taking "all actions required of the Company in the administration of the Plan." The Plan provides for the Committee to be comprised of three to five members, who are appointed and removed by the Company's Chief Executive Officer. The Plan specifies that one of the Committee members is responsible for the routine administration of the Plan and the other members and the Committee as a whole are responsible for matters relating to the investment of the Plan's assets, including the semi-annual or greater review of the investment performance, the condition of the Plan's assets, the selection of a trustee or any other investment managers, review of the performance of the trustee and any other investment managers and the recommendation of changes in investment managers. The Committee was also responsible for the assumption of any responsibilities delegated to an individual member of the Committee in the event that the "Committee deems it necessary and prudent to do so." According to Plan documents, the Committee reviewed the investment options available to Plan participants; the Plan participants were specifically told the "number and type of Investment Funds may be adjusted from time to time by the Investment and Benefits Committee as it deems advisable."[14]

---

[13]This restriction did not apply to Company employees age 55 and over.

[14]The Court declines to address the applicability of ERISA § 404(c), 29 U.S.C. § 1104(c), because although Westar mentioned this provision in its opening brief, it declined to address the issue in its reply to plaintiffs' responsive briefing of the issue. The Court notes that this limited exception to fiduciary liability would apply only if

**C.      Defendants' Motions to Dismiss**

Defendants move to dismiss based on general and individualized grounds, joining in all or parts of one another's motions to dismiss.  Highly summarized, defendants contend: (1) the misrepresentations and omissions alleged in the Complaint were not made by defendants acting in any fiduciary capacity and do not have the requisite nexus to the Plan; (2) certain misrepresentations and omissions alleged in the Complaint are not false or materially misleading; (3) plaintiffs have failed to plead facts establishing a breach of the duties of prudence or loyalty with respect to the selection of Westar's common stock as an investment alternative; (4) plaintiffs do not allege any facts to show that any defendant's own investment in the Company caused him to take or fail to take any actions detrimental to the Plan while acting as an ERISA fiduciary; (5) plaintiffs' claims against Westar are barred by ERISA § 405(c), which exempts the Company from liability for the acts or omissions of persons designated in the Plan to carry out the Company's fiduciary responsibilities; (6) plaintiffs have failed to plead facts stating a claim of co-fiduciary liability under § 405(a); and (7) the Complaint violates the pleading requirements of Fed. R. Civ. P. 8 and 9(b).

**II.      Legal Standard for a Motion to Dismiss**

All defendants move to dismiss for failure to state a claim, pursuant to Rule 12(b)(6) of the

---

participants exercised "independent control" over their investments, and only to the extent that they had such control.  And, a finding that participants had  "independent control" necessarily depends on a finding that they had "sufficient information to make informed decisions with regard to investment alternatives available under the plan. . . . ." 29 C.F.R. § 2550.404c-1(c).  The gravamen of plaintiffs' complaint is that the defendants, through misrepresentation, omission, or other fiduciary breach, did not provide them with the requisite information.  Moreover, the §404(c) exception is an affirmative defense for which defendants bear the burden of proof.  Thus, it is not properly determined at this stage of the proceeding.  *See Allison v. Bank One-Denver*, 289 F.3d 1223, 1238 (10th Cir. 2002) (as amended on denial of rehearing).

Federal Rules of Civil Procedure.[15]  The court will dismiss a cause of action for failure to state a claim

pursuant to Rule 12(b)(6) only when it appears beyond a doubt that the plaintiff can prove no set of

facts in support of the theory of recovery that would entitle him to relief.[16]  The court accepts as true all

well-pleaded facts, as distinguished from conclusory allegations.[17]  All reasonable inferences are viewed

in favor of the plaintiff.[18]  The issue in resolving such a motion is not whether the plaintiff will ultimately

prevail, but whether he is entitled to offer evidence to support the claims.[19]  It is generally unacceptable

for the court to look beyond the four corners of the complaint when deciding a Rule 12(b)(6) motion to

dismiss.[20]  Because the Plan is attached to the Complaint and the parties do not dispute the authenticity

of these documents, the Court will consider their content.[21]

### III.    Analysis

The Court begins its analysis with the most common and generalized grounds for dismissal,

insufficient pleading.  The Court then turns to the defendants' various arguments concerning their

capacity as fiduciaries or the functional and/or temporal scope of their fiduciary capacity, as well as

---

[15]Fed. R. Civ. P. 12(b)(6).

[16]*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Maher v. Durango Metals, Inc.,* 144 F.3d 1302, 1304 (10th Cir. 1998).

[17]*Maher,* 144 F.3d at 1304.

[18]*Witt v. Roadway Exp.,* 136 F.3d 1424, 1428 (10th Cir. 1998).

[19]*In re Sprint Corp. Sec. Litig.,* 232 F. Supp. 2d 1193, 1213 (D. Kan. 2002) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974), *overruled on other grounds, Davis v. Scherer,* 468 U.S. 183 (1984)).

[20]*Dean Witter Reynolds, Inc. v. Howsam,* 261 F.3d 956, 961 (10th Cir. 2001) *overruled on other grounds,* 537 U.S. 79 (2002).

[21]*See In re Sprint Corp. ERISA Litig.*, No. 03-2202-JWL, 2004 WL 1179371, at *6 (D. Kan. May 27, 2004) (citations omitted).

causation.  Finally, the Court will address the defendants' more specific grounds for dismissal of the causes of action.

## A.    Failure to Sufficiently Plead Pursuant to Rules 8 and 9(b)

Defendants move to dismiss the Complaint for insufficient pleading, pursuant to Fed. R. Civ. P. 8.  Defendants argue that the Complaint merely recites, in conclusory fashion, the elements of the various claims for relief, without pleading specific facts and without differentiating the conduct of each defendant that constituted the fiduciary breach alleged in each claim.  To satisfy the pleading requirements of Rule 8(a), the Complaint must sufficiently state  factual assertions, either direct or inferential, respecting each material element necessary to sustain recovery for fiduciary breach through the continuing allocation or designation of fiduciary responsibilities.[22]  Each of the claims for fiduciary breach necessarily requires a showing, pursuant to ERISA § 509, that the defendant was a fiduciary of the plan, was acting in that capacity, and breached a fiduciary duty.[23]  With respect to the claim of co-fiduciary liability,

§ 509 also requires a showing of knowledgeable participation, or enabling the breach of other fiduciaries.  To act within one's capacity as a fiduciary means to act within the scope of one's fiduciary

---

[22] *Harnett v. Parris*, No. 94-4251-SAC, 1995 WL 550036, at * 3 (D. Kan. Aug. 9, 1995) (citing 5 Wright and Miller, *Federal Practice and Procedure* § 1216 at 154-59 (1990) (Plaintiff's pleading does not need to state every element of its claim.); *Davis v. Olin*, 886 F. Supp. 804, 808 (D. Kan. 1995) (quoting *Gooley v. Mobil Oil Co*., 851 F.2d 513, 515 (1st Cir. 1988) (Even though the plaintiff is not required to state every element of the claim, the pleading must still "set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.").

[23] *See* 29 U.S.C. § 1109.

8

duties, while one is serving as a fiduciary.[24]

The Complaint pleads these requisite elements. The Complaint adequately pleads that each defendant is an ERISA fiduciary who in their capacity as fiduciaries, breached certain fiduciary duties, such as failing to respond appropriately to a number of events, facts and circumstances that ultimately resulted in harm to Plan participants. The Complaint expounds in great detail the corporate mismanagement, misfeasance or malfeasance that resulted in lost value of Plan investments. The Complaint identifies the fiduciary role of each defendant, the temporal scope of their fiduciary capacity, and details a number of fiduciary duties breached by defendants Westar, the Committee and Wittig. While the Complaint provides details on the misfeasance or malfeasance of some, but not all Individual Defendants, the Complaint adequately states that these Individual Defendants served as members of the Committee, as well as corporate officers, and thus adequately identifies both their fiduciary capacity and that their fiduciary duties arose out of their status as members of the Committee for an identified period of time. Defendants' contention that the Complaint merely states conclusory allegations is wholly unsupported, given the length, depth and detail of the 77 page, 222 numbered paragraphs in the Complaint.

To the extent that defendants argue that the Complaint is insufficient for failure to plead with the specificity required for pleading fraud, a heightened standard of pleading, the Court denies their motions to dismiss in part. Some courts have applied heightened pleading standards to ERISA claims that

---

[24] *See* 29 U.S.C. § 1109(b) (no fiduciary is liable with respect to a breach committed before he became a fiduciary or after he ceased to be a fiduciary).

involve elements of fraud or misrepresentation; some have not.[25]  Generally, pleadings alleging breaches

of fiduciary duties under ERISA are scrutinized under the notice pleading standard of Rule 8(a).[26]

However, courts have applied the heightened pleading standards of Rule 9(b)[27] to ERISA breach of

fiduciary duty claims that are predicated on allegations of fraudulent conduct.[28]  When breach of

fiduciary claims allege that defendants failed to act reasonably in light of adverse circumstances created

by the fraudulent activity of others, rather than actually participated in the fraud, Rule 8(a) applies.[29]

However, "when the alleged breach of the fiduciary *is* the fraudulent act," plaintiffs may be required to

plead with particularity.[30]  Four of the claims in the Complaint are not based on fraud, but rather on

fiduciary duties of prudent investment, loyalty, monitoring and disclosure, and through the liability of co-

fiduciaries.  Thus, none of these claims must be plead with the specificity required under Rule 9(b).[31]

 The remaining claim is for breach of fiduciary duty by misrepresentation and omission,

specifically the failure to provide complete and accurate information to Plan participants and

---

[25]*Compare Shaffer v. Eden*, 209 F.R.D. 460, 463 (D. Kan. 2002) (J. Murguia applying Rule 9(b) standard to ERISA claim) *with In re Electronic Data Sys. Corp. ERISA Litig.*, 305 F. Supp. 2d 658, 671 (E.D. Tex. 2004) *and In re Xcel Energy, Inc., Securities, Derivative & ERISA Litig.*, 312 F.Supp.2d 1165, 1179 (D.Minn.2004)(heightened pleading requirement applies to a breach premised on a fraud, misrepresentation or omission, but not to a breach for a failure to act, or other types of non-fraud conduct).

[26]*See In re Electronic Data Sys. Corp. ERISA Litig.*, 305 F.Supp. 2d at 672.

[27]Fed. R. Civ. P. 9(b).

[28]*See In re Ikon Office Solutions, Inc. Sec. Litig.*, 86 F. Supp. 2d 481, 488 (E.D. Pa. 2000).

[29]*See In re Xcel ERISA Litig.*, 312 F. Supp. 2d at 1179.

[30]*Id.*

[31] Fed. R. Civ. P. 9(b) provides, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other conditions of mind of a person may be averred generally."

beneficiaries.  The Court more fully discusses the sufficiency of the allegations of this claim, *infra,* in the

discussion concerning the claim of misrepresentation and omission.

**B.      Fiduciary Status**

     **1.      *Westar***

Westar challenges its status as an ERISA fiduciary.  Westar contends that it is not an ERISA

fiduciary at all, that it cannot thus be liable under ERISA for breach of fiduciary duty, and should

therefore be dismissed from this action.  Plaintiffs contend that Westar is an ERISA fiduciary, because it

is not only a named fiduciary of the Plan, it was a functional or *de facto* fiduciary.  Plaintiffs further

contend that Westar is liable for the acts of other fiduciaries through the doctrine of *respondeat*

*superior*.  Plaintiffs also contend that the ERISA § 405(c) safe harbor provision for named fiduciaries

does not apply to Westar, because two exceptions apply, since: (1) Westar  breached its fiduciary duty

by *continuing* to allocate fiduciary responsibilities to the Committee and Wittig; and (2) Westar was a

co-fiduciary.  The Court addresses these several bases for liability in turn.

     **a.      *Named Fiduciary- Safe Harbor Provision of § 405(c)***

A person or entity can become an ERISA employee benefit plan fiduciary by: (1) being named

as a fiduciary in the written plan instrument;[32] (2) being named and identified as a fiduciary pursuant to a

procedure specified in the written plan instrument;[33] or (3) meeting the definition of a functional or *de*

---

[32]29 U.S.C. §1102(a)(1).

[33]29 U.S.C. §1102(a)(2).

11

*facto* fiduciary as set forth in 29 U.S.C. § 1002(21). The first two methods involve an express

designation of the fiduciary by the ERISA plan documents. In the third method a person or entity

assumes fiduciary obligations and is deemed to be a fiduciary if "he exercises any discretionary authority

or discretionary control respecting management of such plan or exercises any authority or control

respecting management or disposition of its assets" or

"he has any discretionary authority or discretionary responsibility in the administration of such plan."[34]

     In determining whether a defendant is a fiduciary under ERISA, the Court first examines the

terms of the ERISA plan.[35] Fiduciary status under ERISA is to be construed liberally, consistent with

ERISA's policies and objectives, and is defined "'in functional terms of control and authority over the

plan, . . . thus expanding the universe of persons subject to fiduciary duties-and to damages-under §

409(a).'"[36] The parties do not dispute that under the terms of the Plan, Westar is the Plan sponsor and

the named fiduciary.

     ***i)    Breach by Continuing Allocation of all Duties***

     Although it concedes that it is a named fiduciary, Westar contends that it has no liability

because it has allocated all of its fiduciary responsibilities to others. Westar relies on ERISA

§ 405(c),[37] the safe harbor provision that limits the liability of a named fiduciary to the extent it has

allocated or designated its fiduciary responsibilities to another. In the Plan, Westar expressly

---

[34]29 U.S.C. § 1002(21)(A).

[35]*Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996).

[36]*Ariz. State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 720 (9th Cir. 1997) (quoting *Mertens v. Hewitt Assoc.,* 508 U.S. 248, 262 (1993) (emphasis and citation omitted)).

[37]29 U.S.C. § 1105(c)(2).

designated to the Committee its fiduciary responsibilities with respect to the administration of the Plan, including day-to-day administration of the Plan, the investment of the Plan's assets and "the full and complete discretionary authority to construe and interpret the provisions of the Plan." Westar further designated to its CEO, who at all relevant times was defendant Wittig, the fiduciary responsibility to appoint and remove the members of the Committee. Westar contends that through these designations of responsibilities, it retains no fiduciary responsibilities under the Plan.

Despite Westar's designation of the Committee and Wittig to carry out its fiduciary responsibilities under the Plan, Westar can still be liable under ERISA § 405(c) if it violated its ERISA § 404(a)(1)[38] duty to act prudently "with respect to such allocation or designation" of fiduciary responsibilities to another, or with respect to its establishment or implementation of a procedure for allocation or designation of fiduciary responsibilities, or "in continuing the allocation or designation" of fiduciary responsibilities to another.[39] Plaintiffs do not contend that Westar breached its fiduciary duty in its allocation or designation of responsibilities to these fiduciaries, nor in its establishment or implementation of the designation procedure. Rather, the Complaint states that Westar breached its duty in continuing the allocation or designation of fiduciary responsibilities to the Committee and Wittig. Under § 405(c), if Westar breached its fiduciary duty in continuing the allocation or designation of fiduciary responsibilities to another, then Westar is liable under ERISA for that failure in continuing the allocation or designation. Westar would not be liable, however, for conduct outside of that parameter,

---

[38] 29 U.S.C. § 1104(a)(1).

[39] 29 U.S.C. § 1105(c)(2)(A)(iii).

unless Westar was an ERISA fiduciary by virtue of some other provision of ERISA, and acting in the scope of its fiduciary responsibilities.

The Complaint describes, with some specificity, how the continuing allocation or designation was itself a breach. The Complaint states that Westar breached its fiduciary duty, *inter alia*, by: failing to remove fiduciaries who it knew or should have known were not qualified to loyally and prudently manage the Plans' assets; failing to conduct an independent investigation into or monitor the merits of investing the Plan's assets in Westar stock, or both; and failing to remedy any fiduciaries' breaches. Thus, the Complaint states that Westar breached its fiduciary duty in continuing to allocate or designate duties to the Committee and Wittig, through failing to monitor and/or remedy the fiduciary breaches of the Committee and Wittig, which Westar could have done by retracting its broad allocation of fiduciary duties to the Committee, and by retracting its allocation to Wittig of the authority to appoint or remove the Committee members. In fact, the Complaint demonstrates that the continuing allocation of duties to the Committee and to Wittig was interrelated. Since Wittig had been designated the authority to appoint and remove Committee members, to the extent Westar acted imprudently in continuing to designate broad fiduciary responsibilities to the Committee, Westar may have acted imprudently in continuing to designate to Wittig the authority to appoint or remove Committee members. For if the Committee's exercise of fiduciary responsibilities was no longer prudent, then Wittig, as the person responsible for appointing and removing Committee members had arguably not acted prudently in his exercise of this responsibility. The Complaint thus states that Westar, despite being a named fiduciary, breached its fiduciary duty under ERISA § 405(c) with respect to its continuing allocation of duties to the Committee and Wittig.

14

The Court finds that there are sufficient factual assertions in the Complaint that Westar did not act prudently in continuing to allocate to Wittig the appointment and removal of Committee members and in continuing to allocate to the Committee the other fiduciary duties under the Plan, by failing to monitor or remedy the acts of the Committee and Wittig and their own breaches of fiduciary duty. The Complaint asserts facts and circumstances sufficient to show that the Committee breached the duties of prudence or loyalty, or both, to Plan participants and beneficiaries by taking no action in response to a number of events and occurrences that would have raised red flags and prompted action in a prudent fiduciary exercising the responsibilities allocated to the Committee. The Complaint asserts facts and circumstances sufficient to show that Wittig breached his duty of prudence and loyalty in many respects, including his duty to monitor and evaluate the performance of the Committee and remedy any fiduciary breaches of the Committee through his power to appoint and remove them. The Complaint also asserts facts and circumstances sufficient to show that Westar knew or should have known of these various facts and circumstances that directly or inferentially evidenced breaches by the Committee or Wittig that would have triggered Westar to exercise its own independent fiduciary duties with respect to the continuing allocation or designation of fiduciary duties to the Committee or Wittig.

Without reiterating the extensive factual assertions in the Complaint, the Court highlights the following assertions, which show directly or circumstantially that Westar breached its fiduciary duty in continuing the allocation of fiduciary duties to the Committee and Wittig, in light of direct and circumstantial evidence that they were breaching their designated fiduciary duties. Beginning in 1996, under Wittig's leadership as then Executive Vice-President in charge of Strategic Planning, Westar embarked on acquisitions of unregulated businesses in the home security field, acquiring three

15

companies at a price exceeding $650 million. By July 1, 1998, the beginning of the "Class Period," this strategic campaign had resulted in the substantial decline of Westar's net income, from $177.3-187.4 million in years 1993-1995 to $46.80 million in 1998 and $12.45 million in 1999. At the same time, Westar saw its long term debt increase 48% and its total debt obligations increase 416.6% from the end of 1997 to the end of 2000.

In 2000, under Wittig's leadership, Westar undertook a restructuring scheme designed to impose upon its utility businesses approximately $1.6 billion in debt used to acquire unregulated assets (about $927 million), while keeping the unregulated assets with a separate entity, Westar. Even while planning and attempting to implement this scheme, which would saddle the utilities with a capital structure of 93% debt, 0% common equity and 7% preferred equity, while endowing Westar with substantial assets and equity, Wittig and other officers and employees of Westar made public statements representing that this restructuring would be beneficial to the utilities (and presumably the shareholders and ERISA plan participants), by "unlock[ing] the value associated with [Westar's] electric assets." Throughout 2001 through 2003, representations that the utilities would benefit from the restructuring continued, despite a host of events, occurrences, and contrary statements by public interest groups and regulators suggesting otherwise. Such statements, events and occurrences included: the Kansas Corporation Commission's ("KCC") scrutiny, examination, criticism, and ultimate rejection of the restructuring scheme and a related rights offering, because of the adverse effect and economic unsoundness of the scheme; the KCC's rejection of a curative financial plan that KCC ordered Westar to submit in late 2001; the KCC's denial in year 2001, of Westar's proposed rate increases of $151 million for the year 2000, rate increases that Wittig and others had represented would bolster the

16

utilities' financials, but that was actually intended to finance the restructuring and executive compensation schemes; the KCC's 2001 determination that rates should actually be decreased by $22.7 million; a variety of executive compensation schemes devised, lobbied and implemented by Wittig and others that leached substantial cash from Westar and were to be triggered by the restructuring in which Wittig and certain senior officers would move from management positions at the financially beleaguered Western Resources, Inc. ("WRI") to officer positions at the financially flush Westar; and information that came to light about the questionable, unauthorized expenditures and abusive use of corporate assets by Wittig and others.  Some of the senior officers implicated, involved in or benefitted by the proposed restructuring, the alleged abuse of corporate assets, and the enriched compensation packages were themselves members of the Committee, and thus, had been appointed by Wittig.  These Committee members/senior officers who participated in such schemes, abuse or largesse, are identified in the Complaint: Wittig; Koupal; Terrill; Geist and Moore.

 Throughout these highly summarized events, the stock prices of the utilities plummeted from $34.25 per share in July 1998, the beginning of the Class Period, to $9.90 per share by December 31, 2002, one day before the end of the Class Period.  During this rapid decline, the stock prices rose at several critical points associated with public statements by Westar, Wittig and others that allegedly misrepresented the economic soundness of the restructuring and its impact on the utilities' financial health.  Even while the stock prices were rapidly declining, from 2001 to 2002, Wittig's total compensation package allegedly  increased in value by 154%, or from approximately $3.9 million to $9.9 million.  And, throughout the alleged machinations, public outcry, regulatory derision and the like, Westar allegedly took no action to evaluate the Committee's competence and proactive or reactive

performance in light of the ominous allegations and serious events.

Despite the allegations that Wittig and other senior officers had engaged in misrepresentations, self-dealing and abuse of corporate assets, Westar allegedly took no action to monitor or evaluate the loyalty and prudence of the Committee members, even though the Committee members were appointed by Wittig and even though some of the Committee members were senior officers allegedly engaging in the same self-dealing and abusive conduct as Wittig. When considering the chronology of events detailed in the Complaint, it is clear that the Complaint asserts sufficient facts necessary to show that Westar, the named fiduciary, breached its fiduciary duty under ERISA § 405(c), in continuing to allocate or designate its fiduciary responsibilities to the Committee and Wittig. Thus, the Complaint states sufficient facts demonstrating that Westar's liability is not limited by virtue of its having allocated all of its fiduciary responsibilities to the Committee and Wittig.

### ii)    *Westar is a Co-fiduciary*

Plaintiffs' second basis to exclude Westar from the protection of the safe harbor provision is because Westar is a co-fiduciary, it is not entitled to the immunity otherwise accorded named fiduciaries whose duties are allocated to others. Under ERISA § 405(c), if the named fiduciary is a co-fiduciary of other fiduciaries of the Plan pursuant to ERISA § 405(a), and the named fiduciary has itself violated the duty of prudence under ERISA § 404(a)(1), then the named fiduciary is not immunized from liability. ERISA § 405(a)(2) imposes co-fiduciary liability where plaintiff can show that by the fiduciary's "failure to comply with section 404(a)(1) [§ 1104(a)(1)] of this Title in the administration of his specific responsibilities which give rise to his

status as a fiduciary, he has enabled such other fiduciary to commit a breach."[40]  While this does not require plaintiffs to show that Westar had knowledge of the other fiduciaries' breach, but merely that Westar enabled their breach, the Complaint states sufficient facts and circumstances from which it could be inferred that Westar had knowledge of the breach of fiduciary duty by the Committee, Committee defendants and Wittig.  The Complaint describes a number of red flags, some addressed in the discussion above, from which one could infer that Westar had knowledge of the other fiduciaries' breaches of duty.

Even if the Complaint fails to state sufficient facts to infer such knowledge, the Complaint states sufficient facts supporting a theory that Westar enabled the Committee members and Wittig to breach their fiduciary duty, by failing to monitor and evaluate their competence and performance, and remedy (through retraction of the delegated authorities and responsibilities) during a prolonged, volatile period of losses, serious allegations, and plummeting stock prices.  Thus, the Complaint states sufficient facts supporting liability through the co-fiduciary exception to §405(c) immunity.

**b.**     ***De facto* Fiduciary**

Although Westar is the named fiduciary of the Plan, the Complaint additionally alleges that Westar is a *de facto* fiduciary, because it  ". . . exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets," acting "through its officers and employees who were appointed by the Company to perform Plan-related fiduciary functions."  The Complaint further alleges that Westar had "effective control" over the

---

[40]29 U.S.C. § 1105(a)(2).

officers and employees and through its Board of Directors, or otherwise, had the authority and discretion to hire and fire its officers and employees and "appoint, monitor, and remove officers and employees from their individual fiduciary roles with respect to the Plan."

A person is a *de facto* fiduciary, not because of language in the Plan, but because of the functions performed by the person. A person or entity is a *de facto* fiduciary if:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.[41]

Plaintiffs essentially argue that Westar was a *de facto* fiduciary because it had control over officers and employees who were involved in Plan administration; presumably, plaintiffs are referring to the Committee members, since they were all officers and employees of Westar. That definition of *de facto* fiduciary circumvents the provisions of §405(c), however, for a company that was a named fiduciary could never limit its liability by allocation of fiduciary responsibilities to others. Section 405(c) certainly does not except the company or employer from the class of named fiduciaries who may seek its safe harbor.

Plaintiffs argue that Westar's fiduciary capacity includes plan administration despite its allocation of these duties to the Committee, because in the Summary Plan Description ("SPD"), Westar is identified as the Plan administrator and the language in the SPD is controlling, over any inconsistent

---

[41]29 U.S.C. § 1002(21)(A).

language in the Plan.[42]  This argument is frivolous.  While Westar is called the Plan administrator on

page 15 of the SPD, this is merely a paragraph identifying the address and phone number where Plan

participants can direct inquiries.  It is clear from the SPD and the Plan, however, that Westar has

designated the Investment and Benefits Committee as the Plan administrator.  The Plan provides that

plan administration is vested in the Committee, stating in pertinent part:

>  Article X   Administration of the Plan
>
>  Section 10.1  Appointment of Investment and Benefits Committee
>  The Chief Executive Officer of the Company shall appoint an Investment and Benefits
>  Committee (Committee) consisting of not less than three nor more than five members to
>  administer the Plan on behalf of the Company.  The members of the Committee shall be
>  employees of the Company and shall serve at the pleasure of the Chief Executive Officer.  The
>  Committee shall take all actions required of the Company in the administration of the Plan
>  except such actions as are required to be taken by the Board of Directors.  The Board of
>  Directors specifically reserves the right to amend or terminate the Plan and to direct the actions
>  of the Committee.

And on page 11 of the SPD, participants are advised

>  Plan Administration
>
>  The Savings Plan is administered by the Investment and Benefits Committee (Committee). The
>  Committee generally oversees the operation of the Plan, interpreting its provisions and
>  authorizing all benefit payments.  The Committee has full and ample discretionary authority to
>  construe and interpret the Plan and all related documents and to determine each participant's
>  interest in and eligibility for any Plan benefit.  The Benefits Department handles the Plan's day-
>  to-day operations.

**c.**      ***Respondeat Superior***

Plaintiffs also argue that Westar is liable for the acts of its agents, officers and employees,

through the common law doctrine of *respondeat superior*.  Westar points out that there is no exception

---

[42]*Semtner v. Group Health Serv. of Okla., Inc.*, 129 F.3d 1390, 1393 (10th Cir. 1997).

from liability under §405(c) based on the common law doctrine of *respondeat superior*. In *National Football Scouting Inc. v. Continental Assurance Co.*,[43] the Tenth Circuit recognized that "in ERISA cases the doctrine of *respondent* [sic] *superior* could impose liability on a principal for the misdeeds of his agent."[44]  The Supreme Court later observed, in dictum, in *Mertens v. Hewitt Assoc.*,[45] that a plaintiff may not be able to extend ERISA liability to a non-fiduciary, through the doctrine of *respondeat superior*. The Ninth Circuit has since held that certain aspects of state agency law remain applicable to ERISA-related claims.[46]  The Fifth Circuit has stated that "the doctrine of *respondeat superior* can be a source of liability in ERISA cases,"[47] but restricted *respondeat superior* liability to those actions in which the principal *actively and knowingly participated* in the agent's breach of fiduciary duty.[48]  This element of active and knowing participation is an element of co-fiduciary liability, as well.  As more fully discussed above, because the Court finds that the Complaint sufficiently states a basis for Westar's liability as a *de facto* fiduciary, or as a named fiduciary who is excepted from the safe harbor provisions of §405(c), the Court declines to address the applicability of this additional, common law basis for Westar's liability.

### 2.    *Wittig*

---

[43]931 F.2d 646 (10th Cir. 1991).

[44]*Id.* at 648.

[45] 508 U.S. 248, 255 n.5 (1993).

[46]*See Ward v. Mgmt. Analysis Co. Employee Disability Benefit Plan*, 135 F.3d 1276 (9th Cir. 1998).

[47]*Am. Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of the U.S.*, 841 F.2d 658 (5th Cir. 1988).

[48]*Id.* at 665 (emphasis added).

Wittig does not dispute that he is an ERISA fiduciary. Instead, he contends that the scope of his fiduciary duties was limited to appointing and removing Committee members. The Court will address these arguments in the context of defendants' motions to dismiss the various claims of fiduciary breach, *infra*.

### 3.    *Committee and Committee Members*

The Committee does not dispute that it is an ERISA fiduciary. Nor do the Individual Defendants who were members of the Committee, Akin, Irick, Geist, Moore, McKee, Martin, Koupal, and Terrill, dispute that they were ERISA fiduciaries. Instead, these Individual Defendants assert that their fiduciary capacity is temporally limited to the time period in which they each respectively served on the Committee.[49] Specifically, the Individual Defendants contend that plaintiffs cannot hold any of them liable for breach of fiduciary duty for those acts or omissions allegedly committed before or after their respective memberships on the Committee. The Complaint alleges that Geist was a member of the Committee for the year 2001; Irick was appointed to the Committee in 2001; Akin was appointed to the Committee in 1999; Moore served as Chairman of the Committee for the years 1998 and 1999; McKee served on the Committee for the year 1998; and Martin served as Chairman of the Committee for the year 2000.[50]

Individual Defendants urge the Court at a minimum, to dismiss so much of plaintiffs' breach of fiduciary claims that are based upon acts or omissions that allegedly occurred before or after they were

---

[49]*See Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) (Not only must a defendant be an ERISA fiduciary, the actionable conduct must be done while the defendant was acting as a fiduciary, that is in performing a fiduciary function.).

[50]Defendant Ruelle, who also moves for dismissal on these grounds, has been dismissed without prejudice.

members of the Committee.  Pursuant to § 409(b) of ERISA, "[n]o fiduciary shall be liable with respect to breach of fiduciary duty . . . if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary."[51]  With respect to the Individual Defendants,  many of the acts or omissions upon which plaintiffs' claims are premised are alleged to have occurred after their service on the Committee.

Plaintiffs concede that Individual Defendants are liable only for those fiduciary breaches that occurred when they served on the Committee, provided, of course, that these defendants were not *de facto* fiduciaries.  Plaintiffs submit, however, that the question of who served when and in what capacity on the Committee can only be adequately answered through full and complete discovery.

At first blush, Individual Defendants' arguments with respect to Moore and McKee are persuasive.  Individual Defendants argue that plaintiffs' claims against them are based upon the premise that Westar and Wittig misrepresented or failed to disclose certain facts regarding the proposed restructuring of the Company in March 2000, the compensation and benefits received by Wittig, and the Company's accounting misrepresentations in 2001 through 2002.  Because defendants Moore and McKee were not members of the Committee after 1999, it follows that they would only be liable for those fiduciary breaches that occurred when they served on the Committee, which appears to predate the underlying actions of Westar and Wittig.  This argument would not extend, of course, to the remaining Individual Defendants, whose tenure on the Committee began during or after the year 2000.

Nevertheless, the Court finds that plaintiffs have sufficiently alleged that the Individual

---

[51]29 U.S.C. § 1109(b).

Defendants are ERISA fiduciaries. Plaintiffs assert that the Individual Defendants, all of whom were officers of the Company who served on the Committee for at least a portion of the Class Period, are potential *de facto* fiduciaries, and the Complaint alleges facts or circumstances from which it can be inferred that these Individual Defendants' actions may have set in motion the circumstances for which Plaintiffs complain. Plaintiffs allege that the Individual Defendants may have exercised discretionary authority over the Plan and the Committee during the Class Period. This is sufficient at this stage of the proceedings. The Court notes that fiduciary status must be determined in the context of the specific fiduciary duties asserted to have been breached. Because the timing of the alleged fiduciary breaches as well as the extent of the Committee members knowledge, participation or involvement in some of the acts that led to the breach of fiduciary claims is at issue, dismissal is premature at this time.

The Individual Defendants also assert that their fiduciary responsibilities are limited in terms of functional scope. The Court will address these arguments in the context of these defendants' motions to dismiss the various claims of fiduciary breach, *infra*.

**C.     Causation**

Defendants contend that the Complaint fails to properly plead causation with respect to any of the claims of fiduciary breach. Causation is an element of the cause of action for fiduciary breach, which the Tenth Circuit has held requires a showing of "some causal link between the alleged breach . . . and the loss plaintiff seeks to recover."[52] But, as plaintiffs point out, causation is an issue of fact not properly considered during this early stage of the proceedings, before discovery and in the context of a

---

[52]*Allison v. Bank One-Denver*, 289 F.3d at 1239.

motion that is considered on the basis of facts alleged in the light most favorable to plaintiffs.

Moreover, the Complaint alleges a number of facts showing causation.  Taking the alleged facts as true, the mismanagement of Westar and consequential financial havoc occurred over an extended period of time.  There were a number of facts and circumstances that were arguably red flags that a prudent investor serving on the Committee would have given heed to and taken appropriate responsive action as a fiduciary acting on behalf of the Plan participants invested in Westar stock.

The Complaint alleges, *inter alia*, that in undertaking a restructuring scheme, in January 2000, the Company changed $927 million of debt on Westar's books to $927 million of Westar common equity, and thereafter in 2000, announced that it would separate its traditional electric utility businesses from its non-electric businesses by means of a "voluntary exchange offer" that would "unlock the value associated with [its] electric assets."  In November 2000, the Company announced that it had found a partner, Public Service of New Mexico ("PSNM") to merge with the Company's utility businesses after the utility, non-utility split.  But, the Complaint avers, the restructuring was "riddled with misrepresentations and omissions of material facts," including that the Asset Allocation agreement provided for imposing $1.6 billion of debt on the utility businesses, debt that had been used to acquire the non-utility businesses and assets.  This Asset Allocation agreement was not released to the public, nor were other material aspects of the Restructuring Plan, including that intercompany receivables that provided Westar with a 17-26% equity stake in the Company were achieved "only by way of the undisclosed elimination of the millions payables owed to WRI by Westar."

The Complaint further alleges that although in a number of public announcements and press releases in 2000, the Company, often through defendant Wittig, painted the restructuring, split and

merger in favorable terms, by April of 2001, information concerning the true state of affairs of Westar was coming to light in the course of the KCC hearings on rates and the restructuring plan. By April 27, 2001, the local newspaper reported that the chief attorney for the Citizens Utility Ratepayers Board had written to the SEC warning that the restructuring threatened the financial health of the utility and that the Company's S-1 Registration Statements had failed to disclose the extent of the misallocation of assets and liabilities. Although the Company countered that this letter was "full of mistakes and inaccuracies," the KCC hearings continued through the summer of 2001 with continued allegations and revelations, through testimony and documents, concerning the potential adversity to the Company's financial health. In May 2001, the KCC issued an order finding that the Company's May 18, 2000 S-1, which sought permission to proceed with the rights offering, was of "no force and effect."

In orders issued the summer of 2001, the KCC questioned the truthfulness of the Company's statements to investors about the nature and effect of the restructuring plan, culminating in the July 20, 2001 KCC order that permanently blocked the rights offering and restructuring, and directed the Company to submit a financial plan within 90 days "restoring WRI to financial health," reflecting a "balanced capital structure," and protecting ratepayers from the risks of the non-utility businesses. On July 25, 2001, the KCC issued an order rejecting the Company's November 27, 2000 application for a rate increase, based on the detrimental Restructuring Plan.

Although the Company filed a financial plan in November 2001, and issued a positive press release about its "substantial debt reduction," the Complaint alleges that the financial plan in fact did not address the problematic asset and liability allocation, but instead kept the "vast majority of the consolidated debt" with the utility businesses, and transferred Westar's Protection One and Oneok

stock assets without consideration.  This led to an expanded inquiry by the KCC, and in January 2002, the KCC issued an order stating that the split, Asset Allocation agreement, rights offering, intercompany receivables and ownership of WRI common stock by Westar, were contrary to the public interest and posed a substantial risk of harm to ratepayers.  In July 2002, *The Topeka Capital Journal* reported that two financial experts testifying at the KCC hearings stated that the Company's credit rating had been lowered to junk status based on the $1.6 billion in debt.  In September 2002, the KCC issued a staff memorandum finding that the Company's financial plan was not in compliance with the directives in the KCC's July 20, 2001 order.  And, in September 2002, Grand Jury subpoenas were issued to the Company.  In November 2002, Wittig was indicted for bank fraud, and the KCC issued an order rejecting the financial plan and directing the Company to transfer its utility division of KPL to a utility only subsidiary of the Company.

In short, the Complaint sets out in a detailed chronology a number of events and occurrences, including findings and orders of the KCC, that demonstrate that in 2000, 2001 and 2002 there was great concern about the Company's financial health, which was revealed not only in the course of the KCC hearings, but in newspaper and media coverage of the KCC hearings, that were within the public's purview, and thus certainly within the purview of the Company's insiders.  Yet, the Complaint alleges, the defendants, insiders in the Company, and ERISA plan fiduciaries, gave little or no heed to these public and regulatory concerns, at least not with respect to their management and oversight of the retirement plans they administered.

Defendants further assert that dismissal is warranted because plaintiffs cannot allege facts that would show they were damaged by defendants' failure to eliminate, divest, limit, evaluate or monitor

28

investments in Company stock.  Defendants assert that had they taken such action, securities laws would have required disclosure, and disclosure of adverse facts would have resulted in a decline of stock price anyway.  Defendants add that they would violate securities laws if they did not disclose such information, and that ERISA may not be construed to "invalidate, impair, or supersede any law of the United States."[53]  Defendants' arguments are based on a theory of "inevitable loss:" that any actions they might have taken would not have prevented the loss in stock value.  Defendants largely rely on *In re McKesson HBOC, Inc. ERISA Litigation*,[54] in which the court dismissed a claim of failure to divest the plan of company stock, finding that there was no feasible option available to the defendants that would not have violated federal securities laws, such as laws precluding insider trading, or that would not have entailed a public disclosure through the SEC that would have had an adverse effect on stock prices, under the "efficient capital markets hypotheses."[55]  The *McKesson* court further found that defendants' other alleged potential options, such as retaining a financial or legal advisor or independent fiduciary, would also not have prevented the decline in stock price.[56]

Defendants also rely on  *Hull v. Policy Management Systems Corp.*[57]  In *Hull*, plaintiff's claim of imprudent investment was dismissed for failure to state a claim.  The court was troubled by plaintiff's attempt to hold the defendants liable solely for their inaction in response to alleged wrongs or

---

[53]ERISA § 514, 29 U.S.C. § 1144(d); 20 C.F.R. § 2550.404c-1(c)(2)(ii).

[54]No. C00-20030RMW, 2002 WL 31431588 (N.D. Cal. Sept. 30, 2002).

[55]*Id.* at *6-7.

[56]*Id.*

[57]No. 3:00-778-17, 2001 WL 1836286  (D.S.C. Feb. 9, 2001).

acts of others, when action would have entailed acquiring inside information in violation of federal securities laws.[58]  *Hull* is distinguishable from this case, however, as there was no allegation that the defendant investment committee had actual knowledge of misrepresentations or misinformation communicated to plan participants.[59]

Here, the Complaint alleges that the Committee Defendants knew or should have known that representations in SEC filings contained misrepresentations.  The Complaint further alleges facts that if true, would circumstantially show that at least some of the Committee Defendants knew or should have known of the misrepresentations; some of the Committee Defendants were officers who were involved in transactions or events underlying or related to the misrepresentations.

Other courts have frowned on the "inevitable loss" arguments accepted by the *McKesson* and *Hull* courts, particularly when the defendant is alleged to have had knowledge of or participation in misrepresentation or misinformation disseminated to plan participants, or where the investment committee "knew or should have known that investing in . . . [company] stock was imprudent."[60]  In  *In re Enron Corp. Securities, Derivative & ERISA Litigation*,[61] the court soundly rejected the *McKesson* rationale, noting that while fiduciaries cannot "enable and encourage" plan participants to violate the law by selling their stock at artificially high prices or avoiding loss before public disclosure of

---

[58]*Id.* at *9

[59]*See id.*

[60]*In re Sears, Roebuck & Co. ERISA Litig.,* 2004 WL 407007, at * 5 (N.D. Ill. Mar. 3, 2004) (citing *Rankin v. Rots*, 278 F. Supp. 2d 853, 878 (E.D. Mich. 2003); *In re WorldCom, Inc. ERISA Litig.*, 263 F. Supp. 2d  745, 765 (S.D.N.Y. 2003)).

[61]284 F.Supp.2d 511 (S.D. Tex. 2003).

the company's financial condition, they must comply with both ERISA and federal securities statutes.[62] The court noted that such compliance would mean "disclosure by Enron officials and plan fiduciaries of Enron's concealed, material financial status to the investing public generally, including plan participants, whether 'impractical' or not, because continuing silence and deceit would only encourage the alleged fraud and increase the extent of injury."[63]

      This Court also questions the propriety of the "inevitable loss" defense to causation. Taking the facts alleged in the Complaint as true, defendants had as much as four years in which to take action, in response to the public dissemination of information through media accounts of regulatory hearings and public outcry. Arguably, their inaction prolonged and exacerbated the loss. Plaintiffs further argue that their allegations of harm are not limited to the drop in stock value. They allege numerous breaches of fiduciary duties, including abuse of corporate assets, deceitful machinations concerning executive compensation and other self-dealing transactions by Company officers. Plaintiffs argue that these other alleged breaches, as detailed above, manifested themselves, in part, by a loss of value to Plan assets.

      Moreover, at this stage of the proceeding it is not plaintiffs' burden to counter or disprove defendants' assertion that they could not have taken any action without violating securities laws of accelerating or exacerbating the demise of the stock value.[64] This Court simply cannot find that it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

---

[62]*Id*. at 565.

[63]*Id.*; *see In re Elec. Data Sys. Corp. ERISA Litig.*, 305 F. Supp. 2d at 673 ("Although the Court agrees that ERISA does not require Defendants to violate federal insider trading laws by imposing a so-called 'duty to tip,' Defendants cannot use the securities laws to shield themselves from their fiduciary duty to protect Plan beneficiaries.").

[64]*Cokenour v. Household Int'l, Inc.*, No. 02-C7921, 2004 WL 725973, at *5 (N.D. Ill. Mar. 30, 2004).

31

entitle him to relief."[65]

**D.     Imprudent Investment Claim**

The Complaint states that defendants breached their fiduciary duty by  "Failure to Prudently and Loyally Manage Plan Assets" in their "selection, monitoring and contribution of the investment alternatives under the Plan . . ." by continuing "to manage, direct, and approve investment of assets of the Plan in Westar stock" and maintaining Westar stock as an investment alternative under the Plan, despite Westar's inappropriate business practices, illegal accounting practices and failure to properly account for the use of corporate assets.

**1.     *Westar***

As discussed above, the Complaint states a claim against Westar for breach of its fiduciary duty of prudence, through its continuing allocation or designation of fiduciary duties to the Committee and Wittig.  Furthermore, the Complaint states a claim that Westar was a co-fiduciary.  As such, Westar can be held accountable for other fiduciaries' breach of this duty.

**2.     *Wittig***

Defendant Wittig contends that the imprudent investment claim should be dismissed against him, as the scope of his fiduciary duties under ERISA did not include administration of the Plan or management of the Plan assets.  The scope of a person's ERISA fiduciary liability, however, is limited by the scope of their fiduciary responsibility.  Section 10.1 of the Plan provides that the CEO of the Company "shall appoint an Investment and Benefits Committee . . . consisting of not less than three nor

---

[65]*Id.* (quoting *Conley v. Gibson*, 355 U.S. at 45-46).

more than five members to administer the Plan on behalf of the Company. The members of the

Committee shall be employees of the Company and shall serve at the pleasure of the Chief Executive

Officer." No other duties were expressly delegated or designated to the CEO under the terms of the

Plan. Thus, Wittig argues, he had no fiduciary responsibilities to administer the Plan or manage Plan

assets, and the First Claim for Relief fails to state a claim against defendant Wittig.

Defendant Wittig contends that the functional scope of his fiduciary duties is very narrow,

confined to his duties to appoint and remove Committee members. If he is a co-fiduciary, however,

then he, like Westar, can be held accountable for other fiduciaries' breach of this duty. ERISA §

405(a)(2)[66] imposes co-fiduciary liability where plaintiff can show that by the fiduciary's "failure to

comply with section 404(a)(1) [§ 1104(a)(1)] of this Title in the administration of his specific

responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit

a breach." The detailed Complaint is replete with factual assertions about defendant Wittig's

misfeasance and malfeasance in operating and managing Westar and its assets. Given these extensive

and detailed assertions, the Complaint sufficiently states that defendant Wittig had knowledge of facts

giving rise to other fiduciaries' duty to take corrective or responsive action. For example, the

Complaint states sufficient facts to infer that defendant Wittig had knowledge that the defendant

Committee and defendant Committee members were breaching their duties of prudent investment by

taking no action to monitor, evaluate or review the performance of Plan assets, particularly Westar

stock.

_____

[66]29 U.S.C. § 1105(a)(2).

Moreover, co-fiduciary liability can be established by facts showing that the fiduciary enabled other fiduciaries in the breach of their respective duties. Again, given the detailed and extensive factual assertions in the Complaint, it sufficiently states facts that defendant Wittig enabled the Committee and its members to breach their duty, by failing to remove them despite their inaction and inertia. Thus, to the extent other fiduciaries are liable for breach of this duty, defendant Wittig can be held liable as a co-fiduciary

### 3.     *Committee and Committee Members*

In addition to noting that their fiduciary responsibility is temporally limited, to the time period in which they respectively served on the Committee, the individual Committee members move to dismiss the imprudent investment claim on several grounds. There is no dispute that this claim concerns matters that were within the scope of the fiduciary responsibilities of the Committee and Committee members. Among their duties to administer the Plan, the Committee and its members' duties included all matters relating to the investment of the Plan's assets, including the semi-annual, or more frequent, review of the investment performance, reviewing the investment options available to Plan participants, reviewing the condition of the Plan's assets, the recommendation of changes in investment managers, and the assumption of any of the responsibilities delegated to an individual member of the Committee in the event that the Committee deems it necessary and prudent. Indeed, Plan participants were told in the Plan that the "number and type of Investment Funds may be adjusted from time to time by the Investment and Benefits Committee as it deems advisable." Defendants contend that the Complaint fails to state a claim for imprudent investment and should be dismissed on the basis of: (1) the settlor doctrine; (2) the presumption of prudence; and (3) causation. The Court addresses these arguments in

34

turn.

      **a.**    *Settlor Doctrine*

Defendants move to dismiss this claim on the basis that an ERISA breach of fiduciary duty claim may not be premised on the performance of settlor functions.

After detailing a number of alleged bad or imprudent acts by the Company, Wittig and others, including some of the Individual Defendant Committee members, and after detailing the adverse financial consequences flowing from those bad acts, the Complaint alleges that the defendants, "[b]y their acts and omissions . . . failed to act prudently by continuing Westar stock as an investment alternative under the Plan." The Complaint alleges that these defendants had fiduciary duties with respect to the selection, monitoring and contribution of the investment alternatives under the Plan, including the fiduciary duty to "monitor and evaluate, among other things, information concerning the Company's structure, performance and prospects, including information made public by the Company." Had the defendants performed their fiduciary duties, the Complaint alleges, they would have "taken appropriate action," including

> eliminating Westar stock as an investment option . . . adopting an
> appropriate divestment policy with respect to Westar stock in the Plan .
> . . appointing an independent fiduciary to evaluate whether Westar
> stock should remain an investment option under the Plan and/or
> determine an appropriate strategy for divestment . . . adopting a policy
> for limiting the amount of Westar stock that could be held in the plan . .
> . and/or notifying the Secretary of Labor of the situation.

Defendants Westar and the Committee contend that the Complaint fails to state a claim for fiduciary breach by imprudent management of investments. They argue that such a claim may not be

35

premised on the performance of settlor functions, for which there is no liability under ERISA.

Plaintiffs acknowledge that "settlor acts" are outside of ERISA's purview of fiduciary obligations.  As the Supreme Court held in *Hughes Aircraft Co. v. Jacobson*,[67] decisions "regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated," are not subject to ERISA liability.[68]  The Supreme Court further held that plan sponsors do not act as ERISA fiduciaries when they adopt, design, amend or terminate pensions or other employee welfare plans.[69]  In *Lockheed Corp. v. Spink*,[70] the Supreme Court extended the settlor doctrine to employee pension plans, stating "[n]othing in ERISA requires employers to establish employee benefit plans.  Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan."[71]  Drawing parallels to trust law, the Supreme Court held that when employers undertake the actions of plan design or modification, "they do not act as fiduciaries, but are analogous to the settlors of a trust."[72]

Defendants focus on paragraph 183 of the Complaint, which asserts that had they complied with their duty of prudent investment, they would have taken certain actions, including: eliminating the Westar stock as an investment option under the Plan; adopting an appropriate divestment policy; or

---

[67]525 U.S. 432 (1999).

[68]*Id*. at 444.

[69]*Id.*

[70]517 U.S. 882 (1996).

[71]*Id.* at 887.

[72] *Id.* at 890.

adopting a policy of limiting the amount of Westar stock that could be held in the Plan.  This,

defendants argue, is a claim that they breached their fiduciary duty by their failure to amend the Plan;

and both amending and failure to amend constitute settlor functions not subject to ERISA liability.

Defendants cite *In re Sprint Corp. ERISA Litigation*,[73] in which this court dismissed plaintiffs'

imprudent investment claim "insofar as it alleges defendants should have amended the plans to reduce

or eliminate investments in Sprint stock."[74]  But the *Sprint* court did not dismiss the imprudent

investment claim entirely, concluding that the complaint stated a claim that defendants breached  their

fiduciary duty by allowing the company stock fund to invest so heavily in Sprint stock.[75]

      While the Complaint does not expressly allege that defendants breached a fiduciary duty by

failing to amend the Plan, one can infer that is part of plaintiffs claim, since the Complaint alleges that

defendants might have taken such action as eliminating the stock as an investment option.  This would

have required an amendment of the Plan.  Section 5.2(a) of the Plan states that the investment funds

shall consist of at least three of ten types of funds; only one of the ten funds is the Company stock fund.

But Section 5.5 of the Plan provides that for matching employer contributions made prior to April 1,

2002, if the contribution was in the form of Company stock, then such employer contribution "shall be

allocated solely to the Company Stock Fund, in which case such contribution . . . may not be

transferred to other Investment Funds . . ."  Thus, at least with respect to employer contributions that

were made in the form of company stock, such contributions would have to be allocated to the

---

[73]No. 03-2202-JWL, 2004 WL 1179371 (D. Kan. May 27, 2004).

[74]*Id*. at *3.

[75]*Id*.

common stock fund. To this extent, absent a Plan amendment, the defendants did not have the discretionary authority to eliminate Westar stock as an investment option, with respect to employer contributions.

Yet, Section 5.2(a) of the Plan states that "[t]he number and type of Investment Funds may be adjusted from time to time by the Investment and Benefits Committee as it deems advisable." Thus, the Complaint states a claim to the extent that it states that defendants breached their fiduciary duty by failing to: select, monitor and evaluate investment alternatives, company structure, performance and prospects; determine and/or adopt appropriate divestment policy or strategy; appoint an independent fiduciary to perform evaluation; and/or notify the Secretary of Labor of the situation. The Complaint is infirm only to the extent that any such actions would require an amendment or modification of the Plan. It appears that under the terms of the Plan, the defendants had the discretionary authority to take these actions.[76]

**b.** ***Presumption of Prudence***

Defendants further contend that the Complaint fails to state a claim for breach of imprudent investment by failing to allege sufficient facts to overcome the presumption that an ERISA fiduciary's decision to invest in company stock was prudent. ERISA fiduciaries have an overriding duty of loyalty and prudence, which may mean that they cannot follow the dictates or directives of a Plan when doing

---

[76]*See* 29 U.S.C. § 1002(21)(A) ("a person is a fiduciary with respect to a plan to the extent . . . he has any discretionary authority or discretionary responsibility in the administration of the plan.); 29 U.S.C. § 1002(21)(A) n. 2 (a person is such a fiduciary "only with respect to those aspects of the plan over which he exercises authority or control").

so would be to the detriment of the Plan participants and beneficiaries.[77]  But, given the special nature of an employee stock ownership plan ("ESOP") and its focus on investing plan assets in the employer's securities, to encourage employees' ownership of their employer company, the Third and Sixth Circuits have held that ESOP trustees are entitled to a presumption of prudence.[78]  Even if the Tenth Circuit would recognize this presumption, defendants fail to show that dismissal is appropriate in this case on the basis of such presumption.

The presumption may not apply to this Plan if it is a non-ESOP employee individual account plan ("EIAP").  An EIAP[79]  may be a non-ESOP or ESOP[80] plan.  The Plan documents indicate that this Plan is a §401(k) savings plan, designed to invest participant contributions in at least three different funds, while requiring that employer contributions be allocated solely to the Company stock fund. Thus, at least with respect to the participant's contributions, the Plan does not require investment primarily in Company stock, and the Plan follows the general ERISA goal of diversification of investments.

Defendants argue that the presumption of prudence also applies to non-ESOP EIAP's.   But

---

[77]  *Eaves v. Penn*, 587 F.2d 453, 459 (10th Cir. 1978) ("While an ESOP fiduciary may be released from certain Per se violations on investments in employer securities . . . , the structure of [ERISA] itself requires that in making an investment decision of whether or not a plan's assets should be invested in employers [sic] securities, an ESOP fiduciary, just as fiduciaries of other plans, is governed by the 'solely in the interest' and 'prudence' tests of §§ 404(a)(1)(A) and (B).").

[78]*Moench v. Robertson*, 62 F.3d 553, 568-71 (3d Cir. 1995) *cert. denied,* 516 U.S. 1116 (1996); *Kuper v. Iovenko*, 66 F.3d 1447, 1458-59 (6th Cir. 1995).

[79]ERISA § 407(d)(3)(A), 29 U.S.C. § 1107(d)(3)(A) defines an individual account plan as either a profit sharing, stock bonus, thrift or savings plan.

[80]ERISA §407(d)(6), 29 U.S.C. § 1107(d)(6) defines an ESOP as an individual account plan that is a stock bonus plan, which is designed to invest primarily in qualifying employer securities.

39

the genesis of the presumption of prudence is a recognition that ESOPs are different; they are designed to invest in company stock with a goal of employee ownership in the company, rather than diversification and minimization of risk.[81]  Congress intended that ESOP plans function as both "an employee retirement benefit plan and a 'technique of corporate finance' that would encourage employee ownership," recognizing that "ESOPs are not designed to guarantee retirement benefits, and place employee retirement assets at much greater risk than the typical diversified ERISA plan."[82]  Thus, an ESOP fiduciary who is charged with breach of the duty of prudent investment is accorded a presumption of prudence,  given the fiduciary's duty to invest in accordance with the terms of the Plan. Needless to say, the presumption can be rebutted, by showing an abuse of discretion.[83]  All ERISA fiduciaries have an overriding duty of loyalty and prudence, which may mean that they cannot follow the dictates or directives of a Plan when doing so would be to the detriment of the Plan participants and beneficiaries.[84]  Nevertheless, the special nature of ESOP plans is the basis for the presumption of prudence accorded ESOP fiduciaries.

The Court is not persuaded by defendants' argument that the presumption of prudence necessarily extends to non-ESOP fiduciaries.  The Third Circuit in *Moench v. Robertson*[85] and the

---

[81]*See Moench*, 62 F.3d at 568.

[82]*Chao v. Hall Holding Co., Inc.,* 285 F.3d 415, 425 (6th Cir. 2002) *cert. denied,* 537 U.S. 1168 (2003) (citations omitted).

[83]*Moench*, 62 F.3d at 571.

[84]*Eaves*, 587 F.2d at 459.

[85]62 F.3d at 571.

Sixth Circuit in *Kuper v. Iovenko*,[86] applied the presumption to fiduciaries of ESOP plans. While defendants cite case law supporting their argument for extension of the presumption to non-ESOP plan fiduciaries, the Court finds it unpersuasive. In *Pennsylvania Federation v. Norfolk Southern Corp. Thoroughbred Retirement Investment Plan,*[87] for example, the court held that the *Moench* presumption applied to non-ESOP EIAP fiduciaries as well, because the presumption was based on the common law of trusts, "which provide[s] that 'where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion.'[88] But in *Moench*, the court referred to the common law of trusts for the general standard of review of the merits of an ERISA fiduciary's decision, not to define the scope of the presumption.[89] *Moench* does not stand for the proposition that the presumption of prudence applies to a fiduciary's failure to divest, even when the Plan requires diversification; rather the presumption of prudence is limited to ESOPs in recognition that those plans require investment in company stock, departing from the general non-ESOP rule of diversification.[90] Defendants also cite a Ninth Circuit opinion, *Wright v. Oregon Metallurgical Corp.,*[91] but contrary to defendants' assertion, that court declined to "adopt wholesale the *Moench* standard," while merely hinting that the

---

[86] 66 F.3d at 1447.

[87] No. Civ. A. 02-9049, 2004 WL 228685, at *7 (E.D. Pa., Feb. 4, 2004).

[88] *Id.* (citing *Moench*, 62 F.3d at 566).

[89] *Moench*, 62 F.3d at 553.

[90] *See id.*

[91] 360 F.3d 1090 (9th Cir. 2004).

presumption might extend to an EIAP stock bonus plan.[92]  Nor is the Court persuaded by other cases

cited by defendants, including *Steinman v. Hicks*,[93] where without any analysis or discussion, the court

applied the presumption of prudence to a non-ESOP EIAP profit sharing plan that had both a 401(k)

salary deferral component and a profit sharing component.[94]

      Moreover, the Court is not persuaded that the presumption should be applied at this, the

motion to dismiss stage of the proceeding.  While there are decisions requiring plaintiffs to rebut the

presumption through pleading, the Court finds more persuasive  the First Circuit's  *Lalonde v.*

*Textron, Inc.* opinion in which it declined to apply the presumption of prudence at the pleading stage.[95]

In *Electronic Data Systems Corp. ERISA Litigation*,[96] the court declined to consider the ESOP

presumption at the motion to dismiss stage, noting that courts generally do not consider presumptions at

the pleading stage and that it would violate the liberal notice pleading standard of Fed. R. Civ. P. 8(a)

to require plaintiff to affirmatively plead sufficient facts to rebut the presumption.[97]  After a thorough

analysis of the cases that expressly or impliedly applied the presumption, Judge Lungstrum observed in

*In re Sprint Corp. ERISA Litigation*,[98] that the  presumption was not rebutted and dismissal was

---

[92]*Id.* at 1098 n. 3.

[93]252 F. Supp. 2d 746 (C.D. Ill.) *aff'd*, 352 F.3d 1101 (7th Cir. 2003).

[94]*Id.*

[95]369 F.3d 1 (1st Cir. 2004) (vacating district court's Rule 12(b)(6) dismissal of imprudent investment claim
for insufficient pleading).

[96] 305 F. Supp. 2d at 658.

[97]*See id.*

[98]2004 WL 1179371, at *11.

granted in cases with "weak, vague, and/or conclusory allegations, particularly those that simply allege a decline in employer stock value."[99]

Assuming, *arguendo*, the presumption of prudence applies to this Plan, and assuming further that it is applied at this stage, the Complaint sufficiently pleads facts rebutting the presumption; it does not suffer from insufficient, weak, vague or conclusory allegations.  The Complaint states a claim by describing at great length the Company's plummeting stock value and income, and soaring debt and losses at key points during the ill-fated restructuring quest, to the disadvantage of Plan participants whose contributions were invested in company stock.  Plaintiffs have alleged more than "[m]ere stock fluctuations . . . that trend downward significantly," and they have provided much more detailed allegations than the conclusory allegations of "unsuitable investment" that was "unduly risky and trading at an inflated price" that were determined insufficient to rebut the ESOP presumption applied in *In re Duke Energy ERISA Litigation*,[100] for example.

Like Judge Lungstrum in *In re Sprint Corp. ERISA Litigation*,[101] this Court rejects the pleading standard urged by the defendants, that is, the "impending collapse" of the company.  This is a misstatement of the standard defined in *Moench*.  In *Moench*, the court held that declining stock prices alone would not overcome the presumption to preclude dismissal; but the presumption could be overcome by pleading that an insider fiduciary had knowledge of the impending collapse of the stock,

---

[99] *Id.*

[100] 281 F. Supp. 2d 786, 794-95 (W.D.N.C. 2003).

[101] 2004 WL 1179371, at *3.

along with the fiduciary's own "conflicted status" or perhaps other troubling circumstances.[102]  Here, the Complaint alleges that stock prices plunged from $34.25 per share in July 1998, the beginning of the Class Period, to $9.90 per share by December 31, 2002, one day before the end of the Class Period.  The Complaint alleges that the NYSE halted trading on one day in November, 2002, when the stock value plunged 22%.  The Complaint further alleges that by the beginning of the Class Period, the Company's net income had declined from $177.3-187.4 million in years 1993-1995 to $46.80 million in 1998 and $12.45 million in 1999.  At the same time, the Company's long term debt increased 48% and its total debt obligations increase 416.6% from the end of 1997 to the end of 2000.

In addition to these dire financial circumstances, the Complaint alleges gross mismanagement by the CEO and other officers, including some officers who were members of the Committee that served as Plan administrator.  The Complaint alleges that officers raided the Company's "coffers" through the use of "deceit and subterfuge," engaged in a  "sudden shift in corporate strategy and focus" to embark on "an aggressive, Enron-like, growth strategy" that was "inherently risky and that the inappropriate and/or illegal behavior of Plan fiduciaries, when revealed, adversely affected the Company's stock price and concomitantly the Plan participants' retirement savings."  The Complaint describes a number of allegedly risky, inappropriate and/or illegal acts, including "round-trip trading" and "wash sales" signified by transactions soon followed by transactions  that in effect nullified by reversal or offset the initial transactions, for purposes of inducing trading  by artificially inflating trading activity, price and earnings figures in order to maintain stock price.

---

[102]*Moench*, 62 F. 3d at 571-72.

The Complaint also alleges that officers, including some who served on the Committee, engaged in rampant personal use and illegal accounting of company assets such as corporate aircraft, and engaged in self-dealing through transactions inuring to certain officers' personal benefit but to the detriment of Westar, the Plan and Plan participants. These transactions included: defendant Wittig and another officer causing the Company to loan $400,000 to a company in which they had personal financial interests, while failing to disclose the same on the Proxy statement; defendant Wittig and another officer's misleading the Company's Human Resources Committee into awarding senior officers Restrictive Share Units in the Company's investment in an entity called Guardian, while failing to disclose their intent to have a related Company acquire Guardian; and a number of other transactions colored by misrepresentations, omissions, subterfuge, deceit and failures to disclose, all for purposes of the officers personal financial gain through executive compensation packages. Even while the stock prices were rapidly declining from 2001 to 2002, defendant Wittig's total compensation package allegedly increased in value by 154%, from approximately $3.9 million to $9.9 million.

The Complaint not only alleges mismanagement through a risky restructuring scheme, but alleges that officers engaged in self-dealing in connection with the restructuring. Through misrepresentations, omissions, subterfuge, deceit and failures to disclose, the officers sought to gain substantial financial benefits through the triggering of certain "change of control" provisions in the restructuring, including lump sum payments, several years of insurance benefits, a "Split Dollar" insurance agreement, and a "buy back" of certain officers' residences at cost plus improvements. In short, the Complaint states a claim that overcomes any presumption of prudence and survives defendants' Rule 12(b)(6) motion for dismissal of this claim of imprudent investment.

45

E.    **Breach of Loyalty Claim**

Defendants move to dismiss the breach of loyalty claim, which asserts that defendants breached

> their duty to avoid conflicts of interest and to promptly resolve them
> when they occurred by continuing to participate in various Company
> compensation programs that created a substantial personal interest in
> certain Defendants in the maintenance of a high public price for Westar
> stock, by failing to engage independent fiduciaries and/or advisors who
> could make independent judgments concerning the Plan's investments
> in Company stock and the information provided to participants and
> beneficiaries concerning  it.

The Complaint avers that instead of resolving such conflicts of interest, the defendants

> advanced and served the interests of Westar and their personal
> interests to the detriment of the Plan participants, for example by
> maintaining the Plan's investment in Westar stock and maintaining
> Westar stock as an investment alternative in the Plan after they knew or
> should have known that such actions were imprudent and not in the
> interests of the Plan participants or beneficiaries.

Defendants argue that this claim should be dismissed because, other than alleging that "certain

Defendants" had an interest in the maintenance of a high public price for Westar stock,

plaintiffs do not allege any facts to show that any defendant's own investment in the Company caused

him to take or fail to take any actions, to the detriment of the Plan, while acting as an ERISA fiduciary.

Nor do plaintiffs allege any other conflicting "loyalty" that would have caused any defendant to breach

its or his duty of loyalty under ERISA.

But the Complaint does allege facts concerning defendants Wittig, Koupal and Terrill's  self-

dealing or conflict of interest.  For example, the Complaint alleges that Wittig misled the Board of

Directors and Wittig and Koupal misled the Human Resources Committee of the Board into approving

change of control provisions in executive compensation, which would have resulted in substantial payouts to executives.  The Complaint alleges that Koupal  misrepresented to the Human Resources Committee that a compensation consultant had recommended a specific provision in the Split Dollar agreement for insurance benefits, a provision that would have cost the Company between $43 and $86 million for the top six senior officers.  The Complaint further alleges that Wittig and Koupal deceptively entered into agreements that exceeded the approval given by the Board of certain changes, expanding the definition of "change in control" triggering their right to huge golden parachute packages and adding an unauthorized "relocation benefit."

The Complaint also alleges that Wittig and Terrill forced out two directors who had been vocally opposing executive compensation changes; Terrill  misrepresented to the Board that the 2000 bonuses for executives had to be based on extraordinary income items as well as ordinary income items; and that when a Board member requested information about Wittig's actual, historic and current compensation, Terrill instead provided the director with copies of the proxies, incomplete information.

Although the Complaint does not identify any other defendant by name, as more fully discussed below, all defendants are alleged to be co-fiduciaries.  Thus, the Complaint adequately states a claim against them as well.  Notably, all of the Individual Defendants were executives and officers of Westar; the compensation at issue would have inured to their gain and benefit as well.  The duty of loyalty requires that ERISA fiduciaries avoid conflicts of interest.[103]  And, "[a] fiduciary with respect to a plan

---

[103]*Mertens*, 508 U.S. at 251-52.

shall not . . . deal with the assets of the plan in his own interest or for his own account."[104]

Finally, the Court notes that the determination of a conflict is a question of fact, making it inappropriate for disposition at this stage of the pleadings.[105]  Plaintiffs' duty of loyalty claims will not be dismissed.

**F.      Internal Monitoring and Disclosure Claim**

Defendants move to dismiss the claim for breach of fiduciary duty by "Failure to Monitor the Company, the Committee, the Committee Defendants and Defendant Wittig and Provide Them with Accurate Information."  More specifically, and sufficient for Rule 8 notice,[106]  the Complaint alleges that these defendants breached their fiduciary duty in: (1) failing to adequately monitor the Committee's investment of the Plan's assets; (2) failing to adequately monitor the Plan's other fiduciaries' implementation of the terms of the Plan, including the investment of the Plan's assets, the establishment of an investment policy and the ongoing monitoring of that policy and the Plan's investments; (3) failing to disclose to the Committee and/or other investing fiduciaries, material facts concerning the financial condition of Westar that they knew or should have known were material to prudent investment decisions concerning the use of Westar stock in the Plans; (4) failing to remove fiduciaries who they knew or should have known were not qualified to loyally and prudently manage the Plans' assets; (5) failing to conduct an independent investigation into and/or monitor the merits of investing the Plan's

---

[104]29 U.S.C. § 1106(b)(1).

[105]*See In re Sears, Roebuck & Co. ERISA Litig.*, 2004 WL 407007, at \*5 (declining to dismiss breach of loyalty claim where plaintiffs allege defendants' compensation was tied to price of company stock).

[106]Fed. R. Civ. P. 8.

assets in Westar stock; and (6) failing to remedy any fiduciaries' breaches, having knowledge of them.

To the extent that defendants move to dismiss this claim on the basis of the settlor doctrine, presumption of prudence, or failure to state causation, for the reasons previously addressed, the Court denies the motions to dismiss this claim.

### 1.    *Westar*

The gravamen of this claim is that the defendants failed to monitor the performance of one another, as fiduciaries of the Plan, and failed to disclose the Company's financial condition, remove fiduciaries, conduct an independent investigation or take other action.  As previously discussed, an ERISA fiduciary can only be liable for acts or failures to act within the scope of its fiduciary responsibilities.  For the reasons addressed above, the Complaint states a claim against Westar, for breach by continuing to allocate and designate duties to Wittig and the Committee.  That exception to the §405(c) safe harbor would apply not only to the imprudent investment claim, but to this claim as well.

### 2.    *Wittig*

Defendant Wittig argues that the scope of his fiduciary duties did not include monitoring the Committee or its members; he contends that his responsibility was limited to appointing and removing Committee members. Defendant Wittig does not dispute that his designated duty of appointment and removal of Committee members was itself a fiduciary duty.  Plaintiffs contend that this designated duty included a duty to monitor and evaluate the competence and performance of the Committee members; and the Complaint states that Wittig breached his fiduciary duty by failing to monitor the Committee's

49

performance.

Wittig argues that his fiduciary responsibilities were limited to the appointment and removal of Committee members; he had no duty to monitor or evaluate the Committee or its members competence or performance of their own fiduciary duties. If this is truly the extent of his responsibility, then he cannot be held accountable with respect to any of plaintiffs claims, for none of those claims of fiduciary breach would apply to someone whose sole responsibilities were to appoint and remove Committee members. But, as discussed in this section, defendant Wittig's responsibility of appointing and removing Committee members also included the responsibility of monitoring and evaluating them. Further, because the Complaint states facts sufficient to plead that defendant Wittig was a co-fiduciary, he can be held accountable for other fiduciaries breaches, including those underlying the claims in this case.

Among other things, the Complaint asserts facts that if true, give rise to a strong inference that Westar knew of some, if not all of the red flags and signs of trouble. Although the Complaint does not expressly state that the Committee did nothing proactively or reactively to address these ominous signs and events, the facts asserted give rise to that inference. And, although the Complaint does not expressly state that Wittig did nothing proactively or reactively, such as monitoring or removal of Committee members, the asserted facts give rise to that inference. This is particularly so with respect to Wittig, since the Complaint details many facts that if true, demonstrate that Wittig was engaged in self-dealing, abuse and schemes detrimental to the utilities and beneficial to his own personal interest.

Although this alleged conduct by Wittig may or may not be the basis for finding that Wittig

breached his fiduciary duties, it certainly gives rise to the inference that Wittig intentionally failed to monitor or remove Committee members. The Complaint also alleges that when certain members of Westar's Board of Directors questioned or protested his machinations, Wittig forced them to resign from the Board. This additional assertion gives rise to an inference that Wittig was neglecting to exercise his fiduciary duty to appoint, monitor and remove the Committee members, because the Committee was impotent, failing to protect the Plan participants and beneficiaries from the effects of Wittig's machinations. Finally the Complaint states sufficient facts to show damage to the plaintiffs; their 401(k) plans were heavily invested in the stock of the utility companies, whose capital structure was obliterated and whose stock prices were plummeting as a result of the conduct of Wittig and others. For these reasons, the Complaint sufficiently states that Wittig and Westar were ERISA fiduciaries, to one degree or another.

The Fourth,[107] Fifth,[108] Seventh,[109] Eighth[110] and Ninth[111] Circuits have found that the power to appoint, retain or remove encompasses a duty to monitor. And ERISA Interpretative Bulletin 75-8, directs that "[a]t reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their

---

[107]*Coyne & Delany Co. v. Selman,* 98 F.3d 1457, 1465 n.10 (4th Cir. 1996) (the fiduciary responsibility to appoint, retain, and remove plan fiduciaries carries with it a duty to appropriately monitor those subject to removal).

[108]*Am. Fed'n of Unions Local 102 v. Equitable Life Assurance Soc'y of the U.S.,* 841 F.2d at 665.

[109]*Leigh v. Engle,* 727 F.2d 113, 133-35 (7th Cir. 1984) (fiduciaries responsible for selecting and retaining plan administrators have a duty to monitor the administrators' action).

[110]*Martin v. Feilen,* 965 F.2d 660, 669-70 (8th Cir. 1992) (a director's power to appoint plan trustees makes him a fiduciary with the duty to monitor the actions of appointed trustees).

[111]*Henry v. Frontier Ind., Inc.,* 863 F.2d 886 (9th Cir. 1988).

performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan."[112]

This Court is persuaded that Wittig's limited fiduciary duty to appoint and remove Committee members included a duty to monitor and evaluate their competence and performance, for purposes of exercising his duty to appoint and remove them.  Indeed, the power to appoint and remove plan fiduciaries is commensurate with the discretionary authority to monitor and evaluate their performance and competence, for purposes of appointment, reappointment or removal.  Absent some inherent responsibility to monitor and evaluate the fiduciaries, the power to appoint and remove them is meaningless; it begs for the exercise of the fiduciary power to appoint or remove, in a manner that is based on something short of reason and prudence itself.  In other words, if a fiduciary has the power to appoint or remove a fiduciary, the appointing fiduciary must exercise that power with prudence; and such prudent exercise of power is impossible without some measure of monitoring, assessment or evaluation.

It is not  clear that the scope of Wittig's fiduciary duty, to appoint, monitor and retain,  included a duty to disclose certain information.[113]  But it is clear, that if Wittig disclosed information or made

---

[112]Department of Labor  ERISA Interpretative Bulletin 75-8, 29 § 2509.75-8, FR-17 Q & A. *But see In re WorldCom, Inc. ERISA Litig.*, 263 F. Supp. 2d at 745, where the court refused to infer a duty to monitor within the duty to appoint; notably, the court granted dismissal of three corporate officers who were alleged to be fiduciaries by virtue of a catchall provision in the ERISA plan that gave *any* officer the duty to act as administrator or investment fiduciary if WorldCom failed to appoint someone to these provisions.

[113] *See, e.g., Crowley ex rel. Corning, Inc. Inv. Plan v. Corning, Inc.*, 234 F. Supp. 2d 222, 229-30 (W.D.N.Y. 2002) (dismissing imprudent investment and failure-to-disclose claims against director defendants who were charged under the plans only with the responsibility to appoint, retain, or remove members of the plan's investment committee); *Hull v. Policy Mgmt. Sys. Corp.,* No. 00-778-17, 2001 WL 1836286, at *6-*7 (same; failure-to-disclose claim).

representations,  he had a duty to not lie.  Despite the limited scope of his fiduciary capacity, as a fiduciary he had a duty under ERISA §404(a)[114] to not affirmatively mis-communicate or mislead Plan participants about material matters regarding their ERISA plan, for "lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA."[115]  The Complaint asserts dozens of facts and circumstances that could be characterized as bad, wrongful, abusive, self-dealing or imprudent conduct by Wittig.  Many of these assertions may be relevant to showing that all or some of the defendants were co-fiduciaries of one another, and may give rise to inferences supporting claims that the Committee and its members breached their fiduciary duty in administering the Plan, and that Westar breached its fiduciary duty in continuing to allocate duties to the Committee and Wittig.  Not as many assertions concern acts that Wittig performed in the scope of appointing, removing or monitoring the Committee members.  Rather,  many of the factual assertions give rise to an inference that Wittig performed *no acts* to monitor, evaluate or assess the competence or performance of Committee members.  Indeed, Wittig's position is that he had no duty to perform any such acts, a tacit admission that he did not monitor, evaluate or assess the Committee members.  Because Wittig's failure to exercise a duty to monitor, assess and evaluate demonstrates a breach of his fiduciary responsibilities, the Complaint, through its host of factual assertions, sufficiently states and shows acts (or a lack of acts) of Wittig that constituted a breach of his fiduciary responsibilities.

### 3. *Committee and Committee Members*

---

[114]29 U.S.C. § 1104(a)(1).

[115]*Varity Corp. v. Howe*, 516 U.S. at 502-05.

With respect to the Committee and Committee members, their duties of plan administration surely included the duty to monitor the Plan investments and assets, including monitoring the Company. And as fiduciaries, each member had some duty, albeit limited, to monitor the other members of the Committee, for they were to work as a body of fiduciaries. The Committee and Committee members argue, however, that the Complaint fails to state a claim of breach by failure to monitor the conduct of Wittig and other officers and employees of the Company. They note that the Complaint alleges more than several times that Wittig engaged in deception and subterfuge, through misrepresentations and/or failing to disclose certain information to others. On the other hand, all of the Committee members were officers, and the Complaint alleges that some of the Committee members engaged in abusive or fraudulent conduct. Because the extent of the Committee members knowledge, participation or involvement in some of the acts that allegedly led to the severe impairment of the stock and Plan assets is at issue, it is not appropriate at this stage of the proceeding for the Court to dismiss these claims based on the defendants' argument that they had no ability to monitor the deceptive conduct of Wittig and others.

Moreover, to the extent that the defendants are arguing that they had no fiduciary duty to monitor, investigate, or acquire information about the Company and its officers outside of their duties to monitor the Plan performance, the Court defers decision on that argument as well. Plan fiduciaries would not generally be expected to investigate, ascertain or monitor the Company and its officers with respect to matters that Plan administrators are not properly privy to. Nevertheless, Plan fiduciaries

54

cannot turn a "blind eye to" what they know in their corporate officer capacity.[116]  In this case, the

Complaint alleges that at least some of the Committee members knew or should have known of these

matters based on their status as officers in the Company, and based on their own conduct.

## G.     Misrepresentation and Omission Claim

Defendants move to dismiss the claim for breach of fiduciary duty in their "Failure to Provide

Complete and Accurate Information to Plan Participants and Beneficiaries."  More specifically, the

Complaint alleges that these defendants had a duty to "act solely in the interests of the participants and

to act prudently," a duty breached by their "making material misrepresentations to the Plan's

participants in their capacity as the Plan's fiduciaries," by

> failing to provide participants and beneficiaries with complete and accurate
> information regarding investment in Westar stock, by transmitting incomplete,
> false and misleading communications to participants of the Plan, and by
> misleading participants and beneficiaries regarding the soundness of Westar
> stock and the prudence of investing their retirement benefits in Westar stock.

This claim, incorporating the other paragraphs of the Complaint that make a number of factual

allegations, states that all defendants' scope of fiduciary responsibilities included "communications to

Plan participants concerning the prudence of investment in Westar stock;" and that defendants made

"material misrepresentations to the Plan's participants in their capacity as the Plans' fiduciaries, the

Defendants breached their fiduciary duties to act solely in the interests of the participants and to act

prudently."  They breached their duty to "speak truthfully" and "not mislead participants" and "to

---

[116]*See Keach v. U.S. Trust Co.,* 240 F. Supp. 2d 840, 844-45 (C.D. Ill. 2002) (fiduciaries should not "bur[y] their heads in the sand and fail to take appropriate action").

disclose truthful information on their own initiative when participants need such information to exercise

their rights under the Plan." Moreover,

> [i]n a plan with various funds available for investment, this duty to
> inform and to disclose also includes: (1) the duty to provide to the
> Plan's participants material information of which the fiduciary has or
> should have knowledge that is sufficient to advise the average plan
> participant of the risks associated with investing in any particular fund;
> and (2) the duty to refrain from material misrepresentations.

These duties were breached by

> failing to provide participants and beneficiaries with complete and
> accurate information regarding investment in Westar stock, by
> transmitting incomplete, false and misleading communications to
> participants of the Plan, and by misleading participants and beneficiaries
> regarding the soundness of Westar stock and the prudence of investing
> their retirement benefits in Westar stock.

According to the "Information Statement" in the SPD, every participant of the Plan receives the

annual report to the shareholders, the Plan and the SPD. In addition, the Information Statement lists the

following documents that participants may have upon request and which are incorporated into the SPD

and Information Statement: the annual 10-K for fiscal year ended December 31, 2001; the Plan's

Annual report on Form 10-K for fiscal year ended December 31, 2001; the current reports on Form

10-Q for the quarters ended March 31, 2002, June 30, 2002 and September 30, 2002; the description

of Westar's Common stock contained in its registration statement form 10, filed May 5, 1949, as

updated by the description contained in Item 7 of the Registrant's Form 10-q for the quarter ended

March 31, 1979; and all other reports filed pursuant to Section 13(a) or 15(d) of the Exchange Act

since the end of the fiscal year covered by Westar Energy's 2001 annual report.

Westar and the Plan also will provide, upon request: the information required by Part I of Form S-8; the Annual report to security holders containing the information required by Rule 14a-3(b) under the Exchange Act for the latest fiscal year; the annual report on Form 10-K for its latest fiscal year; the latest prospectus filed under the Act, that contains audited financial statements (and substantially the same information required by Rule 14a-3(b) or the registration statements on Form SB-2) for the latest fiscal year, if not incorporated by reference from another filing; the Exchange Act registration statement on Form 10 containing audited financial statements for the latest fiscal year; the latest annual report of the Plan filed pursuant to Section 15(d) of the Exchange Act, whether on Form 10 or included as part of the annual report on Form 10-K; and "all reports, proxy statements and other communications distributed to its security holders generally."

### 1.     Material Misrepresentations or Omissions

Defendants assert that the misstatements that plaintiffs allege were misleading during the Class Period were immaterial. In essence, defendants contend that the accounting and business improprieties occurring at Westar during the Class Period were immaterial to the Company's bottom line and that the decline in stock price was caused by some other reason. The Court agrees with plaintiffs that the determination of whether there were inaccurate, incomplete or materially misleading statements such as those detailed in the Complaint, is inappropriate on a motion to dismiss.[117] As the court held in *In re Sprint Corp. ERISA Litigation*, it could infer that communications, including mere corporate "puffery," regarding optimistic expectations of the company's future performance, "could mislead reasonable

---

[117]*See Hill v. BellSouth Corp.*, 313 F. Supp. 2d 1261, 1269 (N.D. Ga. 2004).

employees into investing their retirement plans more heavily in Sprint stock than they would have otherwise been inclined to do."[118]  In addition,  the basis of plaintiffs' claim is not limited to misrepresentations, but also alleges failure to provide Plan participants with truthful information.  The Complaint alleges that the true financial condition of Westar was withheld from Plan participants, harming their ability to make informed investment decisions.  The Court concludes that, taken as true, the allegations in the Complaint are material.

### 2.       Rule 9(b)

As discussed *supra*, because this claim is essentially one for fraud, the Court will apply the heightened standard of pleading required by Rule 9(b).[119]  The only facts alleged in the Complaint that are specific to various defendants and that pertain to communications are:

> Wittig also made numerous false or misleading statements during the Class Period, regarding the performance of Westar and its stock, with the realization that such information would be relied upon by the Plan participants in determining the allocation of their retirement investments.

The Complaint plainly alleges that Wittig concealed material information and engaged in a scheme designed to inflate the Company stock price.  Although Wittig's alleged conduct  may or may not be the basis for finding that Wittig breached his fiduciary duties, this alleged conduct certainly gives rise to the inference that Wittig made representations or omissions that were material.  As the Court stressed *supra*, it is clear, that if Wittig disclosed information or made representations, he had a duty to not lie.  Despite the limited scope of his fiduciary capacity, as a fiduciary he had a duty under ERISA §

---

[118]2004 WL 1179371, at *16.

[119]Fed. R. Civ. P. 9(b).

404(a)[120] to not affirmatively miscommunicate or mislead Plan participants about material matters regarding their ERISA plan, for "lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA."[121] The Court finds that plaintiffs' fraud allegations against Wittig are sufficiently detailed to provide adequate notice of the claims against him.  Further, as discussed *supra*, the Court finds that plaintiffs have sufficiently alleged that Westar is an ERISA fiduciary with respect to the alleged fraudulent activity.

The Complaint does not detail representations or omissions by each Individual Defendant.  But, as required by the Plan, all of the Committee members were also employees, and in fact, executive officers of Westar during the time they served on the Committee.  The Complaint alleges that some of these defendants, in their capacity as executive officers, signed certain documents that are incorporated into the SPD, and therefore defendants were acting in their ERISA fiduciary capacities when they made those representations.  As the court explained in *In re Sprint Corp. ERISA Litigation*, while allegedly false statements in SEC filings cannot create fiduciary status, they can form the basis for liability against a fiduciary.[122]

The Complaint alleges that the Individual Defendants knew or should have known, actually or circumstantially, that representations in the SEC filings contained misrepresentations. Koupal, as Executive Vice President and CAO from July 1995 to October 2001,  signed the Company's 11-Ks for 1998, 1999 and 2000.  Terrill was the Executive Vice President, general counsel and corporate

---

[120]29 U.S.C. § 1104(a)(1).

[121]*Varity Corp. v. Howe*, 516 U.S. at 502-05.

[122]2004 WL 1179371, at *14; s*ee also In re WorldCom, Inc. ERISA Litig.*, 263 F. Supp. 2d at 766-67 (same).

secretary of the Company since May 1999 and before that was the "Vice President and law and corporate secretary."  In those capacities, Terrill signed  the Company's 11-Ks for 1998, 1999 and 2000, and  various SEC filings, including Westar's 2000 Proxy Statement.  Geist, who at various times during the Plan period served as Senior Vice President, CFO and Treasurer, signed  the 10-Q for June 30, 2001, the Form 5500 for 2001 which was submitted to the IRS, and the Company's 11-K for 2002 on behalf of the Plan.  Akin signed the SPD dated June 27, 2002.  Moore signed the Company's 11-Ks for 1998 and 1999.  McKee, signed the Company's 11-K for 1998.  The Court finds that plaintiffs' allegations against Individual Defendants Koupal, Terrill, Geist, Akin, Moore and McKee are sufficiently detailed to provide adequate notice of the fraud claims against them.

By contrast, the Complaint does not state that James A. Martin, who was Chair of the Committee in 2000, or Larry Irick, who served on the Committee in 2001-2002, signed or communicated anything, and their motions to dismiss this claim will be granted.  To the extent that plaintiffs intend to assert that the remaining  Individual Defendants Martin and Irick were complicit in the fraudulent activity, the Court will grant plaintiffs leave to amend to provide greater specificity as required by Rule 9(b).

**H.**     **Co-fiduciary claim**

The Fifth claim for relief is against all defendants,[123] for co-fiduciary liability pursuant to ERISA

---

[123]Claims 1-4 are also against all 12 of the defendants in this case, since Claims 1-4 are against Westar, the Committee, defendant Wittig and the Committee Defendants (which is comprised of all individual defendants with the exception of defendant Wittig).

§ 405[124] in that each defendant "participated knowingly in or undertook to conceal an act or omission" of another fiduciary, knowing such act was a breach, or "by failing to discharge, his, her, or its duties, enabled another fiduciary to commit a breach described in this Claim, or . . . had knowledge of the breach of fiduciary duty described in this Claim and failed to make reasonable efforts to remedy such breach . . ."[125]

All Defendants except Wittig move to dismiss on the basis that Plaintiffs have failed to plead facts stating a claim of co-fiduciary liability under § 405(a).  Defendants contend that not only have Plaintiffs failed to allege facts sufficient to show that a single Defendant breached its or his fiduciary duties to the Plan, but to the extent their claim is based upon Wittig's allegedly fraudulent conduct, they cannot show that he was either acting in his limited fiduciary capacity or that the Company or Committee Defendants had the requisite actual knowledge of his conduct to state a claim under § 405(a).

Here, primary breaches have been upheld against Westar, Wittig, the Committee and the Individual Defendants.  The Court has determined that Westar is not afforded safe harbor under § 405(c).  The Committee and Committee members do not dispute that they were ERISA fiduciaries, although they dispute the scope of their fiduciary responsibilities.  Defendant Wittig agrees that he was an ERISA fiduciary, but contends that his fiduciary responsibilities were limited to appointment and removal of Committee members.  As addressed above, Wittig's duties included monitoring to the

---

[124]29 U.S.C. § 1104

[125]29 U.S.C. § 1105(a)(2)-(3).

extent necessary to his appointment and removal responsibilities.  To the extent the Complaint states that some Committee members breached their duty of loyalty in participating in misconduct,  it states a claim against Wittig for failing to monitor and remove them.  To the extent the Complaint states a claim that Committee members breached their duty of prudence, it states a claim against Wittig for failure to monitor and remove them.  Defendants' motions to dismiss Count Five are denied.

**IT IS THEREFORE ORDERED BY THE COURT THAT:**

1)     Defendants' Motions to Dismiss (Docs. 50, 51, 52, 53 and 55) are granted with respect to plaintiffs' imprudent investment claim insofar as that claim alleges defendants failed to amend or modify the Plan; defendants Martin and Irick's Motion to Dismiss (Doc. 51) is granted with respect to plaintiffs' misrepresentation and omission claim, and plaintiffs are granted thirty (30) days leave to amend the Complaint to cure the pleading deficiencies discussed herein; defendants' motions to dismiss are otherwise denied.;

2)     Plaintiff' motion for leave to file surreply (Doc. 41) is denied; plaintiffs' motion for leave to renew their opposition and response (Doc. 59) is granted; and

3)     Defendants' motions to respond to surreply (Doc. 54 and 58) are denied as moot.

IT IS SO ORDERED.

Dated this  _29th_ day of September, 2005, at Topeka, Kansas.

                         S/ Julie A. Robinson

Julie A. Robinson
United States District Judge

.